








```
KSR     11/27/01    9:50
3:97-CV-01547   WALKER V. SAN DIEGO CITY OF
*121*
*O.*
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BEVERLY WALKER, WHEELCHAIR ACCESS NOW TODAY ON BEHALF OF NOEL NEUDECK, et al., | ) ) ) | Civil No. 97-1547-BTM(LSP) |
| | ) | ORDER AFTER SETTLEMENT CONFERENCE |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF SAN DIEGO, TICKETMASTER, et al., | ) ) ) | |
| Defendants. | ) ) | |

On August 21, 1997, Plaintiffs filed this action claiming that Defendants violated the ADA when it upgraded Qualcomm Stadium. After several years of Court-supervised negotiations with the parties, on or about February 12, 2001, the parties entered into an agreement to settle the action. On March 23, 2001, the parties stipulated, and the District Court ordered, that this Court would have continuing jurisdiction to resolve disputes between the parties regarding implementation of the settlement.

On November 5 and 13, 2001, post-settlement conferences were held. At the end of the conferences, issues not resolved were submitted for final decision under the Court's stipulated continuing jurisdiction. Those issues relate to items 2(b) and 4/7 of a memo entitled "Post-Settlement Remaining Issues" - October 30, 2001"

which was given to the Court at the outset of the initial conference and guided the discussions at both conferences. The parties have met and conferred separately and with the Court on these items and have failed to reach a resolution.

At the time of the settlement of this action, all parties agreed, as a compromise, that with respect to Charger seating, there would be specific semi-ambulatory (hereafter "SA"), transfer (hereafter "T") and companion (hereafter "C") seating designated in the stadium. The parties agreed on the sections and the rows in which the seats were to be located. The driving force behind the negotiations regarding location of the seats was the often-stated intention of the parties to meet the requirements of the law, achieve "disbursement" and "integration" of the disabled community into stadium attendance and to avoid the undesirable stigma attached to disabled persons being relegated to "pockets" of seating. The items in dispute center on specific sections and seats.

The Court is mindful that in fulfilling its responsibilities to the parties of enforcing the settlement agreement the original, underlying objective and intent was to achieve, as nearly as possible, compliance with the Americans with Disabilities Act (hereafter "ADA"). This obligation is an overlay to any proposal of the parties, exists regardless of the individual desires of the parties and continues regardless of the impact on the plaintiffs, Padres, Chargers or any other tenant.

The stadium is a public facility. Thus any issues regarding compliance with the ADA must not only take into consideration the perspective of the parties, but must also be viewed with an eye toward providing access by the disabled community to ALL types of

activities and contests in the stadium, including concerts, religious gatherings, motocross and trucking races and other types of events. The stadium is utilized (or available for use) throughout the year not just the 10 pre and regular season football games involving the Chargers or the 81 Padre home games (not considering post season playoffs). In addition, events take place in the day, at night, and during warm, cold and inclement weather. The Court weighs the foregoing in trying to implement the intention of the parties.

Crafting a solution to meet the seating and access requirements of the ADA is also a factor in meeting that requirement. Failing to do so would result in the advancement of special interests over the principal objectives of the ADA. Taking into account the disabled community as a whole, including those who visit our community and live in places other than San Diego, there are thousands of disabled people who never attend Charger or Padre games but do attend other events. To favor specific individual preferences regarding Charger or Padre events over those who attend other events diminishes the significance of the ADA and inappropriately narrows the focus of the Court's overall responsibilities.

With the foregoing in mind, the Court addresses the issues.

Item 2(b)

The first area of dispute relates to seating in rows 9 & 10 in four sections of the Club Level. (Sections 9, 10, 39 & 40).

The SA and any C seating agreement with respect to row 10 in each section was based on the understanding that seating in row 10 would meet the ADA required 24" leg room between rows 9 and 10. The

City of San Diego (hereafter "City") and the San Diego Chargers (hereafter "Chargers") now indicate that as a result of ramping to be installed to reach the foregoing sections and because of the removal of seating to accommodate wheelchair and companion seating in front of rows 9 and 10, there is not enough room between rows 9 and 10 to meet the 24" requirement. The City further indicates it would be very difficult to achieve the required 24" leg room in each section without sacrificing significant additional seating. The City and the Chargers therefore seek modification of the settlement agreement to accommodate the moving of SA seating in row 10.

Plaintiffs object to any relocation on the general grounds that to do so would violate the existing agreement which was the result of extensive negotiations. Plaintiffs object specifically to the City and Charger proposed changes because in many instances the new seating would obstruct views or require negotiation of additional stairs. Further, plaintiffs protest that moving seats from row 10 to row 9 would be inappropriate because it would be in violation of the goals of the parties to achieve disbursement and integration of disabled persons into the stadium, and meet the requirements of the ADA. Plaintiffs argue that relocation, as requested by the City will instead isolate them into a more concentrated, undesirable "pocket."

During the November 13, 2001 conference, the Charger representatives suggested alternatives which would, from their perspective, meet the goals of the plaintiffs and, at the same time, minimize lost seating and dislocation of existing season ticket holders.

As a result of the conferences on November 5 and 13, 2001,

and after discussions among the parties, the Court has distilled the 2(b) proposals of the parties to the following alternatives:

1. In all 4 sections, remove all the seats in row 5; move the wheelchair seating and row 9 forward an appropriate distance to add the necessary extra space between rows 9 and 10 to meet the ADA 24" leg room requirement.

2. Relocate all row 10 SA and C seats to row 9 in all four sections.

3. In each of the four sections, move T and C seats to aisle seats in different rows (e.g., rows 5 or 6). Move two row 10 SA seats in each section to the aisles – one at each end of each row 10 and remove the row 9 seat directly in front of the row 10 SA aisle seat to provide 24" leg room. If that does not cover all the row 10 SA seats in each section, then relocate the remaining row 10 SA seats to row 9 or let plaintiffs choose where those seats would be relocated (perhaps to the Plaza section). Add some C seats to the T seats that were moved.

4. In each of the four sections, move T and C seats to aisle seats in different sections or rows (e.g., rows 5 or 6). Move all the row 10 SA seats in each section to aisle seats in <u>adjacent</u> sections (sections 8, 11, 38 & 41) where the pathway leading from the ramp provides access to both the designated sections (9, 10, 39, 40) and the adjacent sections (sections 8, 11, 38, 41). The SA seats from section 10 would be relocated to where there are no steps or a nominal number of steps appropriate for SA access. Remove the seat in front of whichever aisle seats were selected in sections 8, 11, 38, & 41, if the appropriate 24" legroom does not exist.

5. In each of sections 9, 10, 39 and 40 move one SA (or one

pair of SA seats) to row 9. In addition, in section 9, move 1 SA to a newly created seat 15 at the end of row 12; in section 10, move one SA pair to row 16, seats 1 and 2 (facing down the aisle steps); in section 39, move 1 SA to row 14, seat 17 and, one SA seat in row 10 to an end seat, removing the seat from the row directly in front of that seat (all of which would require relocation of T and/or TC seats in section 39 to other rows); in section 40, move two SA to row 16, seats 1 and 17.

      6. Some combination of alternatives 2, 3, 4 and 5, above.

      The Court finds that it is not necessary to implement the first alternative, above, to achieve the intention of the parties to both "disburse and integrate" disabled persons into stadium seating and meet the requirements of the ADA. The Court believes the objective can be met by other means and also finds that relocating all row 10 SA seats in each section into row 9 seating likewise does not accomplish that result. In fact, the latter alternative by itself promotes just the opposite result. Therefore, the Court concludes that some combination of seat relocation within and from row 10 into and among other rows either in or adjacent to the designated sections achieves the intention of the parties for "disbursement and integration" and also meets the requirements of the law.

      The Court therefore orders the following:

      In **SECTION 9**, relocation of the 2 SA seats from row 10 into row 9 is sufficient. With this relocation, there would still be 7 non-disabled seats in row 9 (instead of 9). The reduction of two non-disabled seats in row 9 of section 9 does not adversely concentrate disabled persons in violation of either the ADA or the

6

97CV1547

goal of "disbursement and integration."

In **SECTION 10**, relocate the T/TC seats at one end of row 10 to aisle seats of a different row in a nearby section with no more than 6 steps necessary for access. Move one of the SA pair seats in row 10 of section 10 to the aisle seat behind where the T/TC seats (now moved) were located in row 9. Then remove the seat in row 9 directly in front of the aisle seat of row 10 to which the SA seat was moved in row 10. The other SA pair can be moved to row 9. That accomplishes the intent of the parties, meets the requirements of the ADA and no further modifications to section 10 are needed.

In **SECTION 39**, and in **SECTION 40**,

1. Move one SA seat to the aisle seat of row 10 in each of Sections 39 and 40 (which would necessitate removal of the seat in row 9 directly in front of that row 10 seat)

2. Move only one row 10 SA seat to row 9 in each of Sections 39 and 40 (no seat removal necessary).

The foregoing leaves one row 10 SA seat in Section 39 and two in Section 40. As to those seats:

3. Move the one remaining SA seat from row 10 in Section 39 and the two remaining SA seats in row 10 of Section 40 to seats in section 39 or 40 (or an immediately adjacent section) where 24 inch legroom is available AND which has fewer than 7 access stairs (counting from the ramp providing access to those sections) or create the same.

Alternative locations for the above-described item 3 SA seats may be identified in a different Club or Plaza section which section meets the above criteria and which seats are located where a ramp (or pathway) provides comparable access to that of sections 9, 10,

39 and 40, and are located between Club or Plaza sections 2 - 10 or 33 - 40.

Item #4

The agreement between the parties called for 66 wheelchair, companion and "pair" seats at the base of the Plaza level. However, the City now says it has been tentatively determined that only 59 wheelchair and accompanying transfer seats can be created and still meet the pathway and relevant space requirements of the ADA. The City argues that while the exact number of wheelchair seats in the Plaza level could end up at the negotiated 66, the number could also drop below 59. Complicating matters, the final number of wheelchair, companion and "pair" seats may further increase or decrease when "as built plans" are created at the time of or just prior to construction, thus leaving an uncertain but a presently anticipated deficit of 7 seats. As a result of the uncertainty, identifying relocation seating instead of waiting until the eve of construction makes sense.

The City proposes to rectify the deficit of 7 wheelchair seats (and accompanying companion and/or transfer seats) into the View level, at Lower View sections 20 and 21 and to add 3 additional wheelchair and companion seats, thus bringing the total to 10. In defense of the location for those seats, the City argues that while there are wheelchair seats in the View level for Padre baseball games, those that have been identified are not as convenient and tend to isolate the disabled. (The other View level wheelchair seats are not used as much during the baseball season because of the sections of the stadium in which they are located – primarily in deep center field. As a result, unless there is a sell-out or near

sell-out, those seats are underutilized). The City argues the proposed relocation would solve that problem and also provide less expensive seating for Padre and Charger games. In addition, the City argues that there are only 10 Charger events and many other stadium events which would make the seats in the View level at sections 20 and 21 very desirable both from a spectator and cost perspective.

Plaintiffs argue that moving the wheelchair seats from the base of the Plaza level to the View level is a reduction of quality and if that is required, then some of the seats should be allocated to sections 36 or 37, i.e., the "50 yard line" for Charger games since there are no wheelchair seats designated for Charger games with that perspective of the field.

The Court concludes that the proposal of the City is a reasonable solution and is faithful to the intention of the parties regarding "disbursement and integration" and meeting the requirements of the law. There are three additional wheelchair seats proposed beyond the seven that may need to be replaced because of the Plaza seating deficit. In addition, while it is true that the proposed seats would not place viewers on the "50" for football seats, the proposed location is in an area where, for Padres games (if not for other events), they can be used more frequently than any other View seating that would otherwise be available (for Padre games the seats are on the third base side of the stadium, have a direct view of the scoreboard and the Padre dugout. Further, the price of the seats will be lower, thus making them more affordable, and comparing the number of Padre versus Charger events for which they could be used, there are many more opportunities for use.

Finally, the desirability of having seats on the "50 yard line" is subjective. Those that argue that "being on the 50" is superior to any other seating are just as likely to be influenced by "status" or other factors unrelated to any objective, verifiable measures. As with beauty, the desirability of the seat one has (at any event, including a football game) is in the eye of the beholder.

If "as built plans" (the Court wants the plaintiffs to see and review the "as builts" before construction begins) permit a number of seats at the Plaza level greater than 59, the City is ordered to install them, regardless of the additional seats created in the Lower View level by virtue of this order.

IT IS SO ORDERED.

DATE: 11/26/01

LEO S. PAPAS
UNITED STATES MAGISTRATE JUDGE

cc: All Parties
    Judge Barry Ted Moskowitz