















JOEH   1/8/03    9:35
3:97-CV-01547   WALKER V. SAN DIEGO CITY OF
*158*
*OPPM.*

CASEY GWINN, City Attorney
ANITA M. NOONE, Assistant City Attorney
EUGENE P. GORDON, Deputy City Attorney
California Star Bar No. 42615
    Office of City Attorney
    Civil Division
    1200 Third Avenue, Suite 1100
    San Diego, CA 92101
    Telephone: (619) 533-5800
    Facsimile: (619) 533-5847
Attorneys for Defendant City of San Diego

FILED

03 JAN -7 AM 9:46

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

NUNC PRO TUNC

JAN -6 2003

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

BEVERLY WALKER, WHEELCHAIR
ACCESS NOW TODAY ON BEHALF
OF NOEL NEUDECK, KATHLEEN
LENTINI AND ITS MEMBERS,
ALISA SCHUMAN, and ROBERT HANN,
by and through his Guardian Ad Litem,
JEB HANN,

                    Plaintiffs,

        vs.

CITY OF SAN DIEGO, TICKETMASTER,
ACE PARKING, CHARGERS FOOTBALL
COMPANY, SAN DIEGO PADRES
BASEBALL CLUB, SPORTS ARENA
2000 and DOES 1 THROUGH 30,
Inclusive,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 97cv1547 BTM (LAP)

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' REQUEST FOR A
TEMPORARY RESTRAINING ORDER
TO ENJOIN THE SUPER BOWL**

DATE:        **January 9, 2003**
TIME:         **4:00 p.m.**
MAGIS. JUDGE: **LEO S. PAPAS**

Defendant City of San Diego submits the following Memorandum of Points and

Authorities in Opposition to Plaintiffs' request for a Temporary Restraining Order to enjoin the

Super Bowl which is scheduled for January 26, 2003, at Qualcomm Stadium in San Diego,

California:

## I

## <u>INTRODUCTION</u>

The Super Bowl is scheduled to take place at Qualcomm Stadium in San Diego, California,

on January 26, 2003. Plaintiffs request this Court to (1) issue an Order requiring the City of San

1  Diego to immediately make available for sale to persons with disabilities sixty (60) Semi-

2  Ambulatory seats to the Super Bowl which, according to Plaintiffs, are required to be withheld

3  from sale to the general public; (2) issue an Order requiring the City to provide Plaintiffs with

4  tickets for twenty-two (22) Wheelchair Seating Pairs and twenty-eight (28) Semi-Ambulatory

5  Seating Pairs (a total of one hundred (100) tickets), free of charge, to the Super Bowl; and (3) issue

6  a temporary restraining order to enjoin the Super Bowl unless the City of San Diego undertakes

7  certain enumerated architectural modifications at the Stadium.

8      Defendant City of San Diego contends that the Settlement Agreement in the above entitled

9  action is only applicable to events held at Qualcomm Stadium where tickets are made available for

10  purchase to members of the general public, and not to an event such as the Super Bowl which is

11  open only to invited guests and is not open to members of the general public. Therefore, the

12  provision in the Settlement Agreement relating to the withholding of sixty (60) Semi-Ambulatory

13  seats, and the draft provision in the First Amendment to Settlement Agreement relating to the

14  distribution of one hundred free tickets are not applicable to the Super Bowl.

15      The City also contends that a restraining order to prevent the Super Bowl from taking place

16  is a drastic remedy and is not an appropriate remedy for the City's alleged non-compliance with

17  some of the terms of the Agreement.

18      For these reasons, Defendant requests that this Court deny Plaintiffs' requests for Super

19  Bowl tickets and their request for a temporary restraining order to enjoin the Super Bowl.

20                                  **II**

21          **THE SUPER BOWL IS NOT AN EVENT**
            **WHERE TICKETS ARE MADE AVAILABLE**
22          **TO MEMBERS OF THE GENERAL PUBLIC**

23      Tickets to the Super Bowl are not available to members of the general public as the Super

24  Bowl is attended only by invited guests of the National Football League. (Declaration of Fred Otto

25  attached hereto as Exhibit "A," paragraphs 4-5.) Tickets are distributed directly by the League and

26  allocated to the AFC and NFC championship teams, other NFL member teams, and the host team,

27  here, the San Diego Chargers. (Declaration of Fred Otto, paragraphs 7-9.) Although tickets to the

28  Super Bowl are not sold to the general public, the NFL does conduct a lottery through which a

1 | small number of tickets are allocated to winners of this drawing. (Declaration of Fred Otto,
2 | paragraph 6.)

3 | The courts have also acknowledged that the Super Bowl is an event which is not open to

4 | members of the general public. In *Louie v. National Football League*, 185 F. Supp. 2d 1306 (S.D.

5 | Fla. 2002), the court held that the manner in which the National Football League distributed Super

6 | Bowl tickets to its teams and corporate sponsors and through the random lottery did not

7 | discriminate against disabled persons when both non-disabled and disabled fans of the general

8 | public were denied access to the Super Bowl. The court also held that the NFL's Super Bowl ticket

9 | distribution policy did not qualify as a "public accommodation," and thus did not fall within Title

10 | III of the ADA.

11 | Under *Louie*, any suggestion by Plaintiffs that by allowing the National Football League to

12 | hold the Super Bowl at Qualcomm Stadium, the City of San Diego is permitting the NFL to

13 | discriminate against groups of people through its Super Bowl distribution policy is refuted by the

14 | facts and court decisions.

15 | Without question, the Super Bowl is not an event for which tickets are available to the

16 | general public. Plaintiffs' argument that the Super Bowl is like a Rolling Stones concert where

17 | people can stand in line to buy tickets until they are sold out is belied by the evidence. At a Rolling

18 | Stones concert, any member of the general public can stand in line and buy a ticket on a first-

19 | come, first-serve basis, until the tickets are sold out. However, at the Super Bowl, no member of

20 | the general public can stand in line to buy a ticket or be able to buy a ticket to the event in any

21 | other manner. (Declaration of Fred Otto.)

22 | ### III

23 | **THE SETTLEMENT AGREEMENT APPLIES ONLY**
**TO EVENTS HELD AT QUALCOMM STADIUM WHERE**
24 | **SEATS ARE MADE AVAILABLE TO THE GENERAL PUBLIC**

25 | It is clear from a reading of the entire Settlement Agreement that the Agreement applies

26 | only to events held at Qualcomm Stadium where seats are made available for sale to members of

27 | the general public. The Super Bowl is not one of those events, as seats to the Super Bowl are not

28 | / / /

1 available to the general public. The following provisions in the Settlement Agreement make it

2 clear that the Agreement applies only to events that are open to the general public:

3 **A.**    **Definitions**

4        Under the section "Certain Definitions," on page 11 of the Agreement, it is abundantly

5 clear that the Agreement is applicable only to events held at the Stadium that are open to the

6 general public.

7        For example, the term "Event Sponsor" is defined as follows: ". . . any person or entity

8 (including City) that produces or promotes an event at the Stadium *for which tickets are made*

9 *Available for Sale to the general public*, including, but not limited to, the Chargers, Padres, the

10 San Diego State University football team ("SDSU Football Team"), the Holiday Bowl and any

11 other sponsor, tenant, promoter, licensee, or occupant of the Stadium." (Italics added.)

12        The term "Available for Sale" means, "as to any category of seats . . . for an event, *the*

13 *seats made available for sale to the general public* and shall exclude (i) seats located in Skyboxes,

14 and (ii) seats designated for Persons With Disabilities in areas of the Stadium where the other seats

15 in such areas are not available for sale to the general public." (Italics added.)

16        The term "Sell-Out" means "any event held at the Stadium for which seats become

17 unavailable for *purchase by the general public from the Event Sponsor.*" (Italics added.)

18        The term "Sell-Out Date" means a date when Plaintiffs' Representative is provided notice

19 that an event held at the Stadium is a *"Sell-Out."*

20 **B.**    **The Provisions in the Settlement Agreement Pertaining**
          **to the Withholding of Sixty (60) Semi-Ambulatory**
21       **Seats Apply Only to Events Held at the Stadium**
          **Where Tickets are Available to the General Public**
22

23        Exhibit "B" of the Agreement relates to Semi-Ambulatory Seating at the Stadium.

24 Paragraph 1(a) in Exhibit "B" provides, among other things, as follows:

25             Semi-Ambulatory Seats shall be withheld from *sale to the general*
               *public* and may be sold only to persons requesting seats for persons
26             with mobility impairments and, and with respect to the companion
               seats, their companions, until the commencement of the Two-Day
27             Window. During the Two-Day Window, all Semi-Ambulatory Seats
               and all companion seats thereto may be *sold to the general public.*
28             For example, if an event is to be held at any time on a Sunday,

1    tickets for Semi-Ambulatory Seats and companion seats thereto may
     be *sold to the general public* beginning the preceding Friday at
2    8:00 a.m. . . . (Italics added.)

3    Paragraph 1(b) in Exhibit "B" provides as follows:

4        Notwithstanding the foregoing [Paragraph 1(a)], unless all Semi-
         Ambulatory Seats have been sold prior to the Two-Day Window, a
5        total of four (4) Semi-Ambulatory Seats and all companion seats
         shall be held for sale only to persons requesting seats for persons
6        with mobility impairments and their companions . . . until the event
         is scheduled to begin, irrespective of the Two-Day Window.
7

8        By reason of the order of this Court dated January 28, 2002, sixty (60) Semi-Ambulatory

9    Seats are required to be withheld from sale instead of four (4).

10   Paragraph 1(c) in Exhibit "B" provides as follows:

11       Notwithstanding anything to the contrary herein, with respect to any
         event held at the Stadium *for which there is a Sell-Out*, all Semi-
12       Ambulatory Seats and all companion seats thereto (other than the
         four (4) Semi-Ambulatory Seats described in Paragraph 1(b) above)
13       may be released *for sale to the general public* on the Sell-Out Date.
         Following any *Sell-out Date*, persons with mobility impairments, in
14       addition to wheelchair users, may purchase tickets in wheelchair
         locations throughout the Stadium as set forth in Paragraph 1 of
15       Exhibit "C". . . . (Italics added.)

16       Plaintiffs contend that under the above provisions in Exhibit "B," sixty (60) Semi-

17   Ambulatory Seats must be withheld from sale to the general public at the Super Bowl until game

18   time at which time they must be made available for sale to persons with disabilities. Plaintiffs

19   misapprehend the clear language in Paragraph 1 of Exhibit "B."

20       A reading of all of the provisions in Paragraph 1 of Exhibit "B" and a review of the

21   Definitions of "Sell-Out," "Sell-Out Date," and "Event Sponsor" show very clearly that

22   Exhibit "B" applies only to events where seats are available for sale to members of the general

23   public. To conclude otherwise would be to ignore the unambiguous language in Exhibit "B" that

24   Semi-Ambulatory Seats must be withheld from sale to the **general public** and that such seats may

25   only be sold under certain defined circumstances. Clearly, this provision does not apply where no

26   event tickets were sold to the general public in the first instance. Accordingly, since seats at the

27   Super Bowl are not sold to the general public, none of the provisions in Paragraph 1 of

28   Exhibit "B" apply, nor could they apply, to that event.

**C.    The Provisions in the Tentative First Amendment to Settlement Agreement Pertaining to the Distribution of One Hundred (100) Free Tickets Applies Only to Events at the Stadium Where Tickets are Available to Members of the General Public**

The provisions in the Settlement Agreement pertaining to Wheelchair Seating are contained in Exhibit "C" of the Agreement. Paragraph 1 of Exhibit "C" provides that Wheelchair Seating Pairs may only be sold "to persons requesting seats for wheelchair users, and their companions prior to the Two-Day Window or any *Sell-Out Date*. During the Two-Day Window and following any *Sell-Out Date*, Wheelchair Seating Pairs may be sold only to persons requesting seats for wheelchair users, their companions, and any other Persons With Disabilities."

The term "Sell-Out Date" as used in the Agreement is essentially the date that an event is a "Sell-Out." "Sell-Out" means an event "for which seats become unavailable for purchase by the general public from the Event Sponsor." Accordingly, the unambiguous language in Paragraph 1 of Exhibit "C" establishes that the Wheelchair Seating procedures apply only to events at the Stadium where seats are available to the general public. Since tickets to the Super Bowl are not available to the general public, the wheelchair provisions in the Settlement Agreement do not apply to that event.

Nevertheless, Plaintiffs contend that under the First Amendment to Settlement Agreement, Paragraph 1(b) in Exhibit "C," Plaintiffs must be provided with tickets for twenty-two (22) Wheelchair Seating Pairs and twenty-eight (28) Semi-Ambulatory Pairs (a total of one hundred (100) tickets), free of charge, to the Super Bowl. (A copy of the First Amendment to Settlement Agreement is attached hereto as Exhibit "B.")

Initially, it should be noted that Plaintiffs' contention that they have a right to one hundred free tickets is not supported by the Settlement Agreement. Section 20(b) of the Agreement provides that the Agreement may only by modified "in a writing signed by the parties . . . ." The First Amendment to Settlement Agreement has never been signed by the respective parties and thus may not be relied upon by Plaintiffs.

In any event, although the parties have not signed the First Amendment to the Settlement Agreement, it is clear that Paragraph 1(b) in Exhibit "C" in the First Amendment is applicable only

| | |
|---|---|
| 1 | to non-Padres' events where tickets are available to the general public. The use of the term "Event |
| 2 | Sponsor" in Paragraph 1(b), as that term is defined in the Settlement Agreement, shows that the |
| 3 | free ticket policy applies only to events where tickets are available to the general public. |
| 4 | Since there are no wheelchair seating spaces that are "Available for Sale," as that term is |
| 5 | defined in the Settlement Agreement, for an event, such as the Super Bowl, which is not open to |
| 6 | the general public, it is clear that the amended Paragraph 1(b) in Exhibit "C" does not apply to the |
| 7 | Super Bowl. |
| 8 | Clearly, the Settlement Agreement applies only to events at the Stadium that are open to |
| 9 | members of the general public. Since tickets to the Super Bowl are not offered indiscriminately to |
| 10 | the general public on a first-come, first-serve basis, the provisions of the Agreement do not apply |
| 11 | to that event. Therefore, the provisions relating to the withholding of Semi-Ambulatory seats and |
| 12 | the one-hundred (100) free tickets do not apply to the Super Bowl. |

**IV**

**AN ORDER ENJOINING THE SUPER BOWL
IS NOT AN APPROPRIATE REMEDY FOR THE
CITY'S ALLEGED NON-COMPLIANCE WITH CERTAIN
PROVISIONS IN THE SETTLEMENT AGREEMENT**

| | |
|---|---|
| 17 | Plaintiffs assert that the City has not complied with some of the items contained in the |
| 18 | Settlement Agreement, and for that reason, this Court should enjoin the Super Bowl. The drastic |
| 19 | remedy sought by Plaintiffs is not commensurate with the nature of alleged violations. Enjoining |
| 20 | the Super Bowl under the circumstances of this case would be tantamount to shooting a mosquito |
| 21 | with an elephant gun. |
| 22 | This is not a case where the City stood idly by and did nothing to comply with the |
| 23 | provisions of the Settlement Agreement. The City expended approximately $5,000,000 to fulfill its |
| 24 | obligations under the Agreement. The major modifications called for in the agreement, such as the |
| 25 | installation of elevators and lifts, providing additional accessible seating throughout the Stadium, |
| 26 | and creating additional accessible parking were performed by the City. |
| 27 | Plaintiffs have listed a number of items in their moving papers that they contend have not |
| 28 | been fulled complied with by the City. The Court is familiar with most if not all of those items, |

1 and the Court's inspection of the premises scheduled for January 9, 2003, will fully disclose what

2 items need to be resolved. Suffice it to say, in some cases, there has been substantial compliance,

3 such as the grab bars in many of the restrooms which are 1 5/8 inches from the wall instead of the

4 requisite 1 1/2 inches from the wall. Clearly, the City has either strictly or substantially complied

5 with virtually all of the provisions in the Settlement Agreement.

6      If this were a case where the City flagrantly failed to undertake its obligations under the

7 Settlement Agreement resulting in an inaccessible Stadium, Plaintiffs undoubtedly would have

8 brought this suit for a restraining order long before they did. Instead, Plaintiffs attended the 2002

9 Chargers' and Padres' games at the Stadium and waited until the publicity about the Super Bowl

10 increased before bringing their request for injunctive relief.

11      With respect to certain items that the City found either impossible to perform from an

12 engineering standpoint or which have not been remedied in a timely manner, those items are

13 relatively minor in comparison with the number and magnitude of the items that the City

14 satisfactorily performed. As to those items, the Court can, if it deems it necessary, easily fashion

15 an appropriate remedy other than resort to the extreme measure of enjoining the Super Bowl.

16      A temporary restraining order is not an appropriate remedy for Plaintiffs in this case. The

17 sole purpose of a temporary restraining order is to preserve the status quo pending a hearing on the

18 moving party's application for a preliminary injunction. *Granny Goose Foods, Inc. v. Brotherhood*

19 *of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). Here, however, Plaintiffs seek to

20 **alter** the status quo by preventing the Super Bowl from taking place.

21      A restraining order is an equitable remedy. The basis for injunctive relief in the federal

22 courts is a showing of irreparable injury and the inadequacy of legal remedies. *Stanley v.*

23 *University of So. Calif.*, 13 F. 3d 1313, 1320 (9th Cir. 1994). Here, Plaintiffs cannot establish that

24 they will suffer any injury much less irreparable injury, if the request for a restraining order is

25 denied and the Super Bowl is allowed to take place. Furthermore, the legal remedy of monetary

26 damages would adequately compensate Plaintiffs for any injury resulting from the Super Bowl

27 taking place.

28 / / /

1    Moreover, in each case, the court is required to balance the competing claims of injury, and

2    must consider the effect on each party of the granting or withholding of the requested equitable

3    relief. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). Here, the

4    harm to the City if a restraining order is issued far outweighs any threatened injury to Plaintiffs.

5    The City has prepared for the Super Bowl for several years, and has committed considerable

6    resources and personnel in hosting the event, all of which would be lost if a restraining order is

7    issued. On the other hand, the injury to Plaintiffs resulting from a denial of a restraining order

8    would be non-existent or nebulous at best. Clearly, in this case, the harm to the City resulting from

9    the issuance of a restraining order outweighs any harm to Plaintiffs resulting from a denial of the

10   request for equitable relief.

11       Finally, injunctive relief may be refused where it would adversely affect the rights of

12   persons who are not parties to the litigation. *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F. 3d

13   473, 478 ([7th] Cir. 1996). Here, the National Football League which is the sponsor of the Super

14   Bowl, and thousands of people from all over the country and perhaps the world who have made

15   plans to attend the event would all be adversely affected if this Court were to grant a restraining

16   order preventing the Super Bowl from taking place. Numerous business, such as the hotel industry,

17   that have been planning for the event for a considerable period of time would also be adversely

18   affected. The economic consequences to the City of San Diego and third parties flowing from the

19   issuance of a restraining order, while incalculable, would be horrendous.

20       For each of the reasons cited above, this Court should deny Plaintiffs' request for a

21   temporary restraining order.

22                                        **V**

23                                  **CONCLUSION**

24       The provisions in the Settlement Agreement pertaining to the withholding of a certain

25   number of Semi-Ambulatory seats from sale to non-disabled persons and the distribution of a

26   certain number of tickets without charge are inapplicable to an event held at Qualcomm Stadium,

27   such as the Super Bowl, where tickets are not available to members of the general public.

28   / / /

1        Enjoining the Super Bowl is not an appropriate remedy for the inability of Plaintiffs to

2    obtain 100 free tickets to the Super Bowl and the City's alleged non-compliance with some of the

3    relatively minor provisions of the Settlement Agreement. Plaintiffs cannot establish irreparable

4    injury if the Super Bowl is not enjoined, the harm likely to be suffered by the City substantially

5    outweighs any injury threatened by the holding of the Super Bowl, and the issuance of a temporary

6    restraining order would adversely affect the rights of persons who are not parties to the litigation.

7        For all of these reasons, Defendant City of San Diego respectfully requests this Court to (1)

8    deny Plaintiffs' demand for one hundred (100) free tickets to the Super Bowl; (2) deny Plaintiffs'

9    demand that the City make available for sale to persons with disabilities sixty (60) Semi-

10   Ambulatory seats to the Super Bowl; and (3) deny Plaintiffs' request for a temporary restraining

11   order to enjoin the Super Bowl.

12   Dated: January 6, 2003

                                        CASEY GWINN, City Attorney

                                        By _____

                                          EUGENE P. GORDON, Deputy

                                        Attorneys for Defendant City of San Diego

EXHIBIT A

LATHAM & WATKINS
  Kenneth M. Fitzgerald (142505)
  Shannon Z. Petersen (211426)
701 B Street, Suite 2100
San Diego, California 92101-8197
Telephone: (619) 236-1234
Facsimile: (619) 696-7419

Attorneys for Intervenor National
Football League

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY WALKER, WHEELCHAIR ACCESS NOW TODAY ON BEHALF OF NOEL NEUDECK, KATHLEEN LENTINI AND ITS MEMBERS, ALISA SCHUMAN, and ROBERT HANN, by and through his Guardian Ad Litem, JEB HANN,, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN DIEGO, TICKETMASTER, ACE PARKING, CHARGERS FOOTBALL COMPANY, SAN DIEGO PADRES BASEBALL CLUB, SPORTS ARENA 2000 and DOES 1 THROUGH 30, Inclusive,, <br><br> Defendants. | CASE NO. 97cv1547 BTM (LAP) <br><br> DECLARATION OF FRED OTTO IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER |

I, Fred Otto, declare:

    1.   I am over the age of eighteen and competent to testify. The matters set forth below are within my personal knowledge, to which I could and would testify competently if called upon to do so.

1        2.   I am employed full-time as the Director of Events

2 Management in the Special Events Department of the National

3 Football League, 280 Park Avenue, New York, New York 10017

4 (hereafter "NFL").

5        3.   For two years, I have held the position of Ticket

6 Manager and I am familiar with all aspects of the Super Bowl

7 ticketing distribution system. Prior to becoming the Ticketing

8 Manager, I managed the distribution of Super Bowl tickets as a

9 consultant for 20 years.

10        4.   One of my primary responsibilities, as the

11 Ticketing Manager, is to make sure that Super Bowl tickets are

12 consistently and properly reserved and distributed to a

13 predetermined or select group of individuals and entities for

14 each Super Bowl game.

15        5.   Super Bowl tickets are not available for sale to

16 the general public and consequently are not available from or

17 sold to ticket outlets or ticket companies like Ticketmaster or

18 any company that is in the business of selling tickets to the

19 general public. In support of this business practice, the NFL

20 advertises that Super Bowl tickets are not sold to the general

21 public.

22        6.   The NFL holds a random lottery for Super Bowl

23 tickets. Approximately 30,000 people send a certified or

24 registered letter to the NFL between February 1 and June 1 each

25 year. The NFL awards approximately 1,000 tickets to the game. In

26 other words, the only way the general public can attempt to

27 purchase tickets to the Super Bowl is through the lottery award

28 process.

1       7.   Super Bowl tickets are distributed to NFL
2 sponsors, NFL partners, NFL special guests, consultants,
3 selected media, employees of the NFL and of course the NFL
4 thirty-two member clubs. The ticket distribution for Super Bowl
5 XXXVII is as follows: AFC Champion receives 17.5 percent; the
6 NFC Champion receives 17.5 percent; the Host Team receives 5
7 percent; the other 29 Teams receive 34.8 percent; and the NFL
8 Headquarters receives 25.2 percent.

9       8.   The NFL thirty-two member clubs in turn
10 distribute tickets to their selected luxury box holders, club
11 sponsors, and selected season ticket holders, special guests,
12 specific NFL players, coaches and club staff members. Although
13 being a season ticket holder or luxury suite holder does
14 increase the chance to be invited to purchase Super Bowl
15 tickets, season ticket holders and luxury suite holders are not
16 guaranteed the opportunity to purchase Super Bowl tickets.

17      9.   In some instances, selected patrons or guests are
18 invited to the Super Bowl one year, but may not be invited back
19 the following year. The invitation to purchase a Super Bowl
20 ticket is determined solely by the NFL or the above mentioned
21 individuals or entities that are provided the tickets by the
22 NFL. The Super Bowl Game is essentially a private event which is
23 then broadcasted nationally and internationally by licensed
24 television networks.

25     10.   I have reviewed the definition of "Event Sponsor"
26 in the Settlement Agreement and Mutual Release between
27 Plaintiffs and Defendants in this action.  Applying the ordinary
28 and plain meaning of the words "tickets are made Available for

1 Sale to the general public," I can, without reservation, state

2 that the NFL does <u>not</u> make Super Bowl tickets available for sale

3 to the general public, and is therefore not an Event Sponsor

4 under the terms of that Settlement Agreement.

5        I declare that the foregoing is true and correct

6 under the laws of the United States.

7        Executed this _27_ day of December, 2002, at New York,

8 New York.

9

10

11           Fred Otto

Latham & Watkins   SD\365509.1      4     DECLARATION OF FRED OTTO IN OPPOSITION TO
ATTORNEYS AT LAW                         PLAINTIFFS' APPLICATION FOR TEMPORARY
SAN DIEGO                            RESTRAINING ORDER

# FIRST AMENDMENT TO SETTLEMENT AGREEMENT
## AND MUTUAL RELEASE

THIS FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND MUTUAL RELEASE (this "Amendment") is entered into and made effective as of _____, 2002 (the "Effective Date"), by and among Beverly Walker ("Beverly Walker"), Noel Neudeck, Peter Moseley, the legal representative of Kip Hayes and Robert Hann, by and through his guardian ad litem, Jeb Hann, (collectively "Plaintiffs"), and the City of San Diego ("City"), Chargers Football Company, LLC ("Chargers"), Padres L. P. ("Padres") and Ace Parking (collectively " Defendants").

## RECITALS

WHEREAS, Plaintiffs and Defendants are parties to that certain Settlement Agreement and Mutual Release, dated effective as of February 12, 2001 (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement;

WHEREAS, Plaintiffs and Defendants now desire to amend the Agreement on the terms set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the mutual covenants contained herein, the parties hereto hereby agree as follows:

## AGREEMENT

1.      Physical Changes to Qualcomm Stadium.

(a)     Transfer Seats.  Schedules "A-1" and "A-2" attached to Exhibit "A" of the Agreement are hereby deleted in their entirety and replaced with Schedules "A-1" and "A-2" attached to this Amendment.  Other than the substitution of the above-described Schedules, all of the terms and conditions of Paragraph 1(a) of the Agreement remain in full force and effect, unmodified.

(b)     Semi-Ambulatory Seats.  Exhibit "B" (including, without limitation, Schedules "B-1," "B-2" and "B-3" attached thereto) of the Agreement is hereby deleted in its entirety and replaced with Exhibit "B" (including, without limitation, Schedules "B-1," "B-2" and "B-3") attached to this Amendment.  Other than the substitution of the above-described Exhibit, all of the terms and conditions of Paragraph 1(b) of the Agreement remain in full force and effect, unmodified.

(c)    <u>Wheelchair Seating</u>. Exhibit "C" of the Agreement is hereby deleted in its entirety and replaced with Exhibit "C" attached to this Amendment. Other than the substitution of the above-described Exhibit, all of the terms and conditions of Paragraph 1(c) of the Agreement remain in full force and effect, unmodified.

(d)    <u>Additional Programs, Services, Policies and Practices</u>. Exhibit "T" of the Agreement is hereby deleted in its entirety and replaced with Exhibit "T" attached to this Amendment.

2.    <u>Ratification and Reaffirmation</u>.   Except as otherwise expressly provided herein, the Agreement remains in full force and effect unamended, and all of the terms and provisions of the Agreement, as modified by this Amendment, are hereby ratified and reaffirmed by Plaintiffs and Defendants.

*[Signatures on following page]*

IN WITNESS THEREOF, the parties hereto have executed this Amendment effective as of the date first written above.

DEFENDANTS:

THE CITY OF SAN DIEGO

ACE PARKING

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

CHARGERS FOOTBALL COMPANY, LLC

By: _____
      Dean A. Spanos
      President/Vice Chairman

PADRES L.P.

By: _____
      **NEED NEW NAME**
      President & CEO

PLAINTIFFS:

PETER MOSELEY

BEVERLY WALKER

_____

_____

NOEL NEUDECK

_____

KIP HAYES

By : _____

    Name:
    Title: Legal Representative

ROBERT HANN

By: _____

    Name: Jeb Hann
    Title: Guardian Ad Litem

      I HEREBY APPROVE the form and legality of the foregoing First Amendment to Settlement Agreement and Mutual Release this ___ day of _____, 2002.

[CASEY GWINN, City Attorney]

By: _____

    Leslie J. Girard
    Assistant City Attorney

## SCHEDULE "A-1"

See attached.

## <u>SCHEDULE "A-2"</u>

See attached.

## EXHIBIT "B"

### Semi-Ambulatory Seating

1.    (a)    Defendants hereby designate at least 318 Semi-Ambulatory Seats in accordance with this Exhibit B. Defendants also hereby designate one additional adjacent seat which may or may not be a Semi-Ambulatory Seat) as a companion seat for at least 100 of such Semi-Ambulatory Seats in accordance with the terms of this Exhibit B. Each Semi-Ambulatory Seating Pair shall be sold only as a companion pair, at the option of the ticket purchaser, prior to the Two-Day Window. Semi-Ambulatory Seats shall be withheld from sale to the general public and may be sold only to persons requesting seats for persons with mobility impairments and, with respect to the companion seats, their companions, until the commencement of the Two-Day Window. During the Two-Day Window, all Semi-Ambulatory Seats and all companion seats thereto may be sold to the general public. For example, if an event is to be held at any time on a Sunday, tickets for Semi-Ambulatory Seats and companion seats thereto may be sold to the general public beginning the preceding Friday at 8:00 a.m. Further, during the Two-Day Window, persons with mobility impairments, in addition to wheelchair users, may purchase tickets in wheelchair locations throughout the Stadium as set forth in Paragraph 1 of Exhibit "C" attached hereto.

(b)    Notwithstanding the foregoing, unless all Semi-Ambulatory Seats have been sold prior to the Two-Day Window, a total of ~~four (4)~~ sixty (60) Semi-Ambulatory Seats shall be held for sale only to persons requesting seats for persons with mobility impairments and their companions (provided a companion seat is available) until the time the event is scheduled to begin, irrespective of the commencement of the Two-Day Window. The sixty (60) seats which shall be withheld from sale, pursuant to this provision, shall be selected by the applicable Event Sponsor (based upon an equitable disbursement of seats and exclusive of any seats reserved for season ticket holders) on or before August 1, 2002.

(c)    Notwithstanding anything to the contrary herein, with respect to any event held at the Stadium for which there is a Sell-Out, all Semi-Ambulatory Seats and all companion seats thereto (other than the ~~four (4)~~ sixty (60) Semi-Ambulatory Seats described in Paragraph 1(b) above) may be released for sale to the general public on the Sell-Out Date. Following any Sell-Out Date, persons with mobility impairments, in addition to wheelchair users, may purchase tickets in wheelchair locations throughout the Stadium as set forth in Paragraph 1 of Exhibit "~~C"~~"C" attached hereto.

2.    Seats designated as Semi-Ambulatory Seats and as companion seats thereto for Padres' games are set forth in Schedule "B-1" attached hereto. Immediately following the completion of the seating and wheelchair modifications in the Club and Plaza Levels as set forth herein, the Padres shall provide additional Semi-Ambulatory Seats and companion seats in the

locations set forth in Schedule "B-2" attached hereto. Except as otherwise provided herein, Seats installed on the field level as designated in Schedule "B-2" shall be completed on or before April 1, 2002, which field level seats shall be installed on platforms constructed over the field level tunnel stair wells at Sections 31, 33, 35, 37, 39 and 41.

3.    (a) Seats designated as Semi-Ambulatory Seats and as companion seats thereto for all events other than Padres' games are set forth in Schedule "B-3" attached hereto. In the event that In-Fill Seats are added, such In-Fill Seats shall only be installed in Plaza Level Sections 15 through 29.

(b) On or before the installation of such In-Fill Seats, Semi-Ambulatory Seats and companion seats then designated in Plaza Level Sections 15 through 29 shall be relocated to Plaza Level Sections 30 through 45 in locations to be agreed upon by the Plaintiffs' Representative and Defendants' Representative and on a 36 inch wide path of travel that provides access to the east and west end elevators.

(c) If in the first (1ˢᵗ) full Chargers' season following the Contract Modification Completion Date Seats 5 and 6 in Row 9 of Club Level Sections 10 and 40 achieve an average sales rate better than Seat 2 in such Row and Sections, then the Semi-Ambulatory Seat designation shall thereafter be shifted from Seats 3 and 4 in such Row and Sections to Seats 5 and 6 in such Row and Sections. If in the first (1ˢᵗ) full Chargers' season following the Contract Modification Completion Date Seats 9 and 10 in Row 9 of Club Level Section 39 achieve an average sales rate better than Seat 13 in such Row and Section, then the Semi-Ambulatory Seat designation shall thereafter be shifted from Seats 11 and 12 in such Row and Sections to Seats 12 and 13 in such Row and Sections.

(d) Following the date on which the Padres no longer occupy the Stadium, the Chargers shall have the right to cause the City to remove the Semi-Ambulatory Seat platforms to be installed adjacent to the Plaza Level Tunnel Lid and in lieu thereof cause cuts to be made in the railing at the Plaza Level Tunnel Lid at Sections 32, 34, 36, 38, 40 and 42 and relocate the Field Level  Semi-Ambulatory Seats from said platforms to the areas immediately adjacent to said railing cuts.

4.    On or before April 1, 2001, to the extent permitted by law, City will lower any railings in front of Semi-Ambulatory Seats for the purpose of improving the view of semi-ambulatory individuals using such seats in locations designated by Plaintiffs' Representative.

5.    On or before April 1, 2001, City will move Plaza Level Row 23 in Sections 8, 34, and 38 forward at least twelve inches to create a row of Semi-Ambulatory Seats at Plaza Level Row 24 in each of such sections (in addition to the Semi-Ambulatory Seats located in Row 23 of such sections). On or before April 1, 2001, Plaza Level Section 4 will be modified to conform with the design of Plaza Level Sections 8, 34, and 38, which modified Sections shall include Semi-Ambulatory Seats. On or before April 1, 2002, Plaza Level Sections 7 and 37 will be modified to conform with the design of Plaza Level Sections 8, 34, and 38, which modified

~~Sections shall include Semi-Ambulatory Seats.~~ On or before April 1, 2001, City shall paint a clearly visible sign on the floor at each end of the rows in such Sections containing Semi-Ambulatory Seats indicating that such rows are not to be used for through traffic and install similar signs that comply with the Standards on the pillars adjacent to the end of each such row. Throughout the Term, Defendants shall cause the ushers assigned to such seating areas to use reasonable efforts to instruct patrons entering such rows and patrons seated in seats immediately in front of such rows that such rows are not permitted to be used as a thoroughfare.

6.      On or before April 1, 2001, City shall install two (2) television monitors in all areas where existing and future Semi-Ambulatory Seats have obstructed views of Stadium scoreboards.  One of such monitors shall display a view of the main Stadium scoreboard  and the other such monitor shall display the regular broadcast feed for the applicable Stadium event, except in the east end of the View Level or any other areas not under an overhang.

7.      All Stadium seats designated as Semi-Ambulatory Seats and companion seats thereto from and after the Effective Date will be made available for sale as Semi-Ambulatory Seats in accordance with the terms hereof immediately after such designation is made.

## SCHEDULE "B-1"

See attached.

# SCHEDULE "B-2"

See attached.

## SCHEDULE "B-3"

See attached.

## EXHIBIT "C"

### Wheelchair Seating

1.    Wheelchair and companion seats.   Except as provided herein, in addition to the currently existing Wheelchair Seating Pairs, on or before April 1, 2002, City shall complete the installation of at least one hundred and seventy two (172) Wheelchair Seating Pairs in the Stadium in accordance with the terms and conditions of ~~this~~ the Agreement.  The Wheelchair Seating Pairs shall be sold only to persons requesting seats for wheelchair users and their companions prior to the Two-Day Window or any Sell-Out Date.  During the Two-Day Window and following any Sell-Out Date, Wheelchair Seating Pairs may be sold only to persons requesting seats for wheelchair users, their companions, and any other Persons With Disabilities. Such seats which are sold to persons requesting seats for Persons With Disabilities, other than wheelchair users, shall comply with the requirements of the Standards and Title 24 for Semi-Ambulatory Seats and/or Transfer Seats.  Wheelchair Seating Pairs will be added in the following numbers at the following locations:

(a)    Tunnel Lid–Top of Field Level.       Sixty-~~six (66)~~ one (61) Wheelchair Seating Pairs will be provided on the tunnel lid at the top of the Field Level Tunnel located at the bottom of the Plaza Level.  The Wheelchair Seating Pairs will be located immediately adjacent to the railing and will be installed in Sections 2, 4, 6, 8, 10, 12, 14, 38, 40, 44, 59, and 61.  The six Wheelchair Seating Pairs located in Sections 59 and 61 will be covered by a tarp during baseball games played at the Stadium.

(b)    Field Level.    ~~During~~ At the ~~times~~ time the Stadium is ~~not~~ no longer used in a baseball configuration, ~~the~~ City ~~will~~ shall promptly add  twenty (20) Wheelchair Seating Pairs in Field Level Sections 18 and 19.  ~~The parties agree that such~~ Beginning July 1, 2002 and continuing until the date of completion of installation of the twenty (20) seats referenced in this provision, the applicable Event Sponsor shall provide Plaintiffs with tickets for twenty-two (22) Wheelchair Seating Pairs ~~may be removed during the times the Stadium is used in a baseball configuration~~ and twenty-eight (28) Semi-Ambulatory Pairs for all non-Padres events, free of charge, all in locations selected by the applicable Event Sponsor (based upon an equitable disbursement of seats and exclusive of any seats reserved for season ticket holders).  These tickets shall be distributed by Plaintiffs' Representative, at his or her discretion, without approval by or notice to Defendants.  Wheelchair seating spaces which are provided to Plaintiffs pursuant to this provision shall be counted in determining the number of seats sold for purposes of determining whether the 90 percent sales' threshold referenced in Paragraph 1.(c)(iii) of Exhibit C is met.  Plaintiff Beverly Walker shall be entitled to select these twenty-two (22) Wheelchair Seating Pairs and twenty-eight (28) Semi-Ambulatory Pairs

<u>from seats currently available for the 2002-2003 Chargers' Season</u>.

      (c)   <u>Club Level</u>

          (i)  <u>Initial Installation</u>.    On or before April 1, 2002, a total of twenty-four (24) Wheelchair Seating Pairs (the "Initial Club Wheelchair Seating Pairs") shall be installed in the Club Level and located in Sections 9, 10, 39 and 40, which Initial Club Wheelchair Seating Pairs shall be accessible by ramps constructed immediately adjacent thereto. City will also install an accessible ramp between Club Level Sections 32 and 33. If feasible, the ramps will be constructed with a slope ratio not to exceed 1:14 (rise:run). In the event the ramps are constructed with a slope ratio greater than or equal to 1:14, ushers and other employees of Defendants shall be reasonably available to provide assistance to Persons With Disabilities who need assistance. In no event shall the slope ratio of such ramps exceed 1:12. All installations and construction required pursuant to this subparagraph 1(c)(i) shall be completed by City on or before April 1, 2002.

          (ii)  <u>Additional Installation</u>.    City shall install eighteen (18) Wheelchair Seating Pairs adjacent to and accessed by ramps in the Club Level per twelve consecutive calendar month period during the Term following the Discount Expiration Date not to exceed a total of fifty-six (56) Wheelchair Seating Pairs in the Club Level (in addition to, and exclusive of, the Initial Club Wheelchair Seating) if warranted, as determined in accordance with the following subparagraph 1(c)(iii). The Wheelchair Seating Pairs to be installed pursuant to this subparagraph 1(c)(ii) shall be referred to herein as "Additional Club Wheelchair Seating Pairs." After each of the first and second twelve consecutive calendar month periods following the Discount Expiration Date, Additional Club Wheelchair Seating Pairs shall be installed eighteen (18) at a time, if warranted, as determined in accordance with the following subparagraph 1(c)(iii). On the third twelve consecutive calendar month period following the Discount Expiration Date, twenty (20) Additional Club Wheelchair Seating Pairs shall be installed, if warranted, as determined in accordance with the following subparagraph 1(c) (iii).

          (iii)  <u>Trigger For Additional Installation</u>. The obligation to install Additional Club Wheelchair Seating Pairs for any twelve consecutive calendar month period during the Term following the Discount Expiration Date pursuant to the preceding subparagraph 1(c)(ii) will be triggered if at least 90 percent of the wheelchair seating spaces in the Club Level that are Available For Sale and at least 90 per cent of the wheelchair seating spaces that are Available For Sale in all other areas of the Stadium are sold at at least one half of all of the events held at the Stadium at which tickets are Available for Sale in such twelve-consecutive calendar month period. All Additional Club Wheelchair Seating Pairs required to be installed pursuant to this Section shall be installed by City within ninety (90) days following the date on which such obligation is triggered; provided, however, if such obligation is triggered within ninety (90) days prior

to any Chargers' pre-season game or during any Chargers' season, then such installation deadline shall be extended to the ninetieth (90th) day following the last Chargers' home game (including post-season games) of such season. Notwithstanding any provision to the contrary herein:

       (A) The availability of Wheelchair Seating Pairs shall be tested in accordance with the Testing Procedures set forth on Exhibit "D" attached hereto.

       (B) The wheelchair seating spaces currently over the vomitoria and accessed through the Loge Level shall not be counted in determining the number of wheelchair seating spaces Available For Sale in the Club Level.

       (C) Wheelchair seating spaces that are not Available For Sale shall not be counted for purposes of the Testing Procedures (ie. such seating spaces shall not be counted in determining the number of wheelchair seating spaces Available For Sale or the number of wheelchair seating spaces sold for the purpose of determining whether the 90 percent sales' threshold is met).

       (D) Any wheelchair seating spaces which are purchased by the City pursuant to the Chargers Occupancy Agreement or which are distributed by any Event Sponsor on a complimentary basis, shall not be counted in determining the number of such seats sold for the purpose of determining whether the 90 percent sales' threshold is met, except as otherwise provided in Exhibit "T" attached hereto.

   (d) <u>Press Level</u>. Thirty-~~four (34)~~ three (33) Wheelchair Seating Pairs will be provided in Press Level Sections 4, 11, 46, 47, 55, and 56.

   (e) <u>Plaza Level</u>. Twenty-~~eight (28)~~ six (26) Wheelchair Seating Pairs will be provided in Plaza Level Sections 5, 35, 50, 51, 52 and 53.

2.   <u>Existing Wheelchair Seating</u>.

   (a) <u>Windscreens</u>. City shall complete the installation of windscreens the top of which shall be not lower than 72 inches from the finished floor and the bottom of which shall be not higher than one inch from the finished floor, and with gaps of no greater than one inch between the wall and any panels or between any of the panels, at each Wheelchair Seating Pair location that currently exists in the Loge Level in the Stadium, with the exception of the Wheelchair Seating Pairs that exist in Loge Level Sections 49 and 54. 50% of such windscreens shall be installed on or before April 1, 2001, the remaining windscreens shall be installed on or before April 1, 2002.

   (b) <u>T.V. Monitors</u>. On or before April 1, 2001, City shall install two (2) television monitors in all areas where existing and future Wheelchair Seating Pairs have

obstructed views of the Stadium's East End scoreboard. One of such monitors shall display a view of the main Stadium scoreboard and the other such monitor shall display the regular broadcast feed for the applicable Stadium event, except in the East End View Level or any other areas not under an overhang.

(c) <u>Railings</u>. On or before April 1, 2001, to the extent allowed by law, City shall lower any railings in front of Wheelchair Seating Pairs for the purpose of improving the view of wheelchair patrons in locations designated by Plaintiffs' Representative.

(d) <u>Correct Sections</u>. The parties agree that the wheelchair seating space items enumerated in Numbers 48, 52, 85, 86 and 90 in the Survey do not need to be corrected.

(e) <u>Signage</u>. On or before April 1, 2001 all existing Wheelchair Seating Pairs shall be designated with the International Symbol of Accessibility. On or before April 1, 2001, City shall install signs in each area where Wheelchair Seating Pairs are located that state "Reserved for persons with mobility impairments and companion seating only." City shall remove any and all decals in the Stadium referencing "WCA".

(f) <u>Removal of Chains</u>. On or before April 1, 2001, chains at wheelchair location entrances shall be removed.

(g) <u>Dining Tables</u>. On or before April 1, 2001, interior dining areas and tables shall provide wheelchair seating in the percentages required by the Standards.

(h) <u>Exterior Dining Area</u>. On or before April 1, 2001, the exterior dining area at the East End shall be modified to provide level seating locations for wheelchair users in the percentages required by the Standards.

(i) <u>Handrails</u>. On or before April 1, 2001, handrails at wheelchair locations shall be modified to loop downward, in configurations which comply with the Standards.

(j) <u>Trash Cans</u>. On or before April 1, 2001 trash cans at aisles adjacent to wheelchair locations shall be located or affixed so that they cannot interfere with access to the wheelchair locations.

3. On or before April 1, 2001, at such times that wheelchair seating spaces are sold to Persons With Disabilities who are not wheelchair users, City shall equip such spaces with a removable seat (the design of which shall be approved by the Plaintiffs' Representative, which approval shall not be unreasonably withheld or delayed).

4. All Stadium seats and spaces designated as Wheelchair Seating Pairs from and

284418.02-Los Angeles S1A

after the Effective Date will be made available for sale as Wheelchair Seating Pairs in accordance with the terms hereof immediately after such designation is made.

## EXHIBIT "T"

## Additional Programs, Services, Policies, and Practices

Defendants will provide the following programs and services and adhere to the following policies and practices throughout the Term:

1.    Once the Wheelchair Seating Pairs on the tunnel lid of the Field Level are installed and thereafter throughout the Term, at all Chargers' games held at the Stadium, City shall cause to be provided to persons occupying the Wheelchair Seating Pairs on the tunnel lid waiter service comparable to the service offered to patrons seated in the Club Level.  At all events other than Chargers' events, where waiter service is provided in the Club Level, City shall cause to be provided to persons occupying the Wheelchair Seating Pairs on the tunnel lid or in View Level Sections 20 and 21 waiter service comparable to the service offered to patrons seated in the Club Level, but only to the extent that all the wheelchair spaces in the Club Level are used or sold at such event.

2.    Any tickets for accessible seats which are purchased by the City pursuant to the Chargers Occupancy Agreement for any Chargers' event shall be given by the City to a disabled organization(s) approved by the Plaintiffs' Representative and the Defendants' Representative for distribution to Persons With Disabilities.  One percent of the total seats which are purchased by the City shall be Wheelchair Seating Pairs, one percent shall be Transfer Seats, and one percent shall be Semi-Ambulatory Seats, provided that the number of seats purchased in each category of disabled seating shall be limited to an aggregate of less then ten percent (10%) of the seats Available For Sale in each such category prior to purchase by the City as set forth in paragraph 4 below.

3.    Any tickets for accessible seats which are distributed by any Event Sponsor on a complimentary basis with respect to any event at the Stadium, shall be given to persons who would otherwise be qualified to purchase such tickets, provided that the number of Wheelchair Seating Pairs, Transfer Seats and Semi-Ambulatory Seats so distributed shall, in the aggregate, be less than ten percent (10%) of the seats Available For Sale in each such category as set forth in Paragraph 4 below.

4.    Notwithstanding anything to the contrary herein, the sum of (i) any wheelchair seating spaces purchased in the Club Level by the City pursuant to the Chargers Occupancy Agreement plus (ii) any wheelchair seating spaces in the Club Level distributed by any Event Sponsor on a complimentary basis shall be less than ten percent (10%) of the wheelchair seating spaces Available for Sale in the Club Level.  Notwithstanding anything to the contrary herein, the sum of (i) any wheelchair seating spaces purchased in all areas of the Stadium other than the

Club Level by the City pursuant to the Chargers Occupancy Agreement plus (ii) any wheelchair seating spaces in all areas of the Stadium other than the Club Level distributed by any Event Sponsor on a complimentary basis shall be less than ten percent (10%) of the wheelchair seating spaces Available for Sale in such areas. Notwithstanding anything to the contrary herein, any wheelchair seating spaces so purchased by the City or distributed by the Chargers in excess of such sum shall be counted as seating spaces sold for the purpose of the triggering mechanism set forth in Paragraph 1(c)(iii) of Exhibit C attached hereto. Notwithstanding anything to the contrary herein, with respect to any event at the Stadium, the sum of (i) any Transfer Seats purchased by the City pursuant to the Chargers Occupancy Agreement plus (ii) any Transfer Seats distributed by any Event Sponsor on a complimentary basis shall be less than ten percent (10%) of the Transfer Seats Available for Sale in the Stadium. Notwithstanding anything to the contrary herein, any Transfer Seats so purchased by the City or distributed by the Chargers in excess of such sum shall be counted as seating spaces sold for the purpose of the triggering mechanism set forth in Paragraph 4 of Exhibit A attached hereto.

5. Except for seats in the Club Level and the suites, the Chargers will continue to offer discounted tickets for accessible seats (and seats designated as companion seats thereto) to Persons With Disabilities at a price equal to the 2nd lowest price category for non-accessible seats, which obligation shall continue until the expiration of the Term.

6. The Chargers and Padres will include the following information in their respective materials sent to season ticket holders (which obligation shall continue until the Guaranty Expiration Date):

> Certain seats at Qualcomm Stadium are designated for use by Persons With Disabilities and their companions. It is a violation of state law for any person who is not disabled to purchase and use tickets for such seats. California Civil Code Section 54.3 provides that any person who interferes with the rights of any individual with a disability is liable for money damages of a minimum of one thousand dollars ($1,000) or three times the amount of actual damages, whichever is greater, and attorneys' fees as may determined by the court. Your payment of this invoice evidences your acknowledgment of the foregoing statement concerning accessible seating.

In addition, the Chargers and Padres shall provide information to their personnel and third party ticket vendors regarding the location and availability of all accessible seating and shall (i) advise such personnel and vendors that such seating may only be sold in accordance with the terms of this Agreement and (ii) require such personnel and vendors who sell tickets over the telephone to advise prospective purchasers of accessible seats as follows:

> The seats you wish to purchase are designated for use by Persons With Disabilities and their companions. Please be advised that it is a violation of state law for any person who is not disabled to purchase and use tickets for such seats.

On or before April 1, 2001, the City shall post a sign at each ticket window located at the Stadium visible to ticket purchasers stating that:

> Certain seats at Qualcomm Stadium are designated for use by Persons With Disabilities and their companions. It is a violation of state law for any person who is not disabled to purchase and use tickets for such seats.

7.      City will permit disabled organizations identified by Plaintiffs' Representative to sponsor two events at the Stadium in each calendar year without payment of the normal rental fee for the event, but otherwise in accordance with the City's standard rental agreement. City will provide free parking for attendees, provided the event is put on without charge to the public. In the event that patrons are charged for admission to such event, the cost of parking shall be discounted by 50%. The actual expense incurred arising out of the operation of the event shall be borne by the sponsoring organization.

8.      The Padres (for so long as they occupy the Stadium) and the Chargers will each schedule a "Disabled Fan Day" in each calendar year and shall designate the date thereof in a written notice to the Plaintiffs' Representative not less than thirty (30) days prior to the commencement of their respective seasons. For each "Disabled Fan Day," one Skybox which is normally sold to the general public shall be provided without charge to a disabled persons organization to be determined by Plaintiffs (but subject to the prior reasonable approval of the Chargers or the Padres, as applicable), provided the Skybox has not been sold before the sixth (6th) calendar day preceding the event.

9.      On or before April 1, 2001, City will prepare and distribute a brochure, approved by Plaintiffs' Representative, which approval shall not be unreasonably withheld or delayed, which sets forth the policies and procedures as set forth in this Agreement (the "Access Guide"). The Access Guide shall also identify generally the locations of accessible seating, accessible paths of travel, and other accessible features and facilities, the location and number of accessible parking stalls, and the number of additional stalls that are designated for disabled parking. A full copy of the Access Guide shall be available for viewing on the City's website. The Access Guide will be distributed with Chargers' and Padres' season tickets for disabled seats at the Stadium and with other tickets that are purchased for disabled seats at the Stadium from Chargers or Padres ticket offices and will also be made available at Stadium will-call windows, the Stadium accessible ticket windows, the Stadium customer service office and the Stadium security office. Access Guides shall also be provided to disabled organizations for distribution to Persons With Disabilities. During the first (1st) year of the Term, the City shall meet with such organizations (including any organizations reasonably identified by Plaintiffs' Representative) to communicate the policies and procedures set forth in the Access Guide.

10.      The Chargers and Padres shall include information regarding disabled seating and disabled parking locations in brochures and other material (to the extent that such materials describe seating and parking locations) that the Chargers and Padres disseminate to the general public. A link to the Access Guide shall be included in the information available at any web sites

controlled by the Chargers or Padres. City shall use commercially reasonable efforts to cause the SDSU Football Team and Holiday Bowl to include information regarding disabled seating and disabled parking locations in brochures and other material (to the extent that such materials describe seating and parking locations) that they disseminate to the general public.

11.    During the period commencing on the date which is the later to occur of April 1, 2002 or the Contract Modification Completion Date and ending on the Discount Expiration Date, the City shall cause all Stadium Event Sponsors (through the grant of a subsidy or other means) to provide a fifty percent (50%) discount on all tickets for accessible seats sold to Persons With Disabilities for all events at the Stadium other than Chargers' events, the Superbowl, post-season Padres games and any events where tickets are not available for purchase by the general public.

12.    Free parking shall be provided at all Stadium events to persons with permanent disabilities displaying (i) a disabled license plate on their vehicle or a parking placard for Persons With Disabilities issued by the Department of Motor Vehicles together with a corresponding identification card or registration issued in connection therewith, or (ii) a public transportation pass, which on its face clearly indicates that it is issued only to Persons With Disabilities.

13.    The Chargers and the Padres shall add a message welcoming the disabled community to each of their respective events during the Term to (i) the public announcement audio loop broadcast over the outer ring public address system and (ii) the message board within the inner-bowl of the Stadium. City shall add a message to the Stadium's marquis sign on Friar's Road announcing the Stadium's new accessible features and welcoming the disabled community to the Stadium.

14.    On or before June 1, 2001, the Chargers shall provide Beverly Walker with the following: one football autographed by Junior Seau, one new Chargers' official jersey and one new Chargers' official game jacket.

(m) 15.    On or before May 1, 2001, the Padres shall provide Beverly Walker with one baseball autographed by Trevor Hoffman; one bat autographed by Tony Gwynn; and one official jersey and game jacket. During the Padres 2001 season, the Padres shall provide Beverly Walker with one opportunity to throw out the first pitch before a game and to have a photograph taken of the event. Prior to the time that tickets are made available to the general public, the Padres shall provide Beverly Walker with the opportunity to choose the location of her season ticket seats at the new Padres ballpark when it is completed.

ORIGINAL

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BEVERLY WALKER, WHEELCHAIR ACCESS NOW TODAY ON BEHALF OF NOEL NEUDECK, KATHLEEN LENTINI AND ITS MEMBERS, ALISA SCHUMAN, AND ROBERT HANN, by and through his Guardian Ad Litem, JEB HANN, | ) ) ) ) ) ) ) ) | Case No. 97cv1547BTM (LAP)   **DECLARATION OF SERVICE** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CITY OF SAN DIEGO, TICKETMASTER ACE PARKING, CHARGERS FOOTBALL COMPANY, SAN DIEGO PADRES BASEBALL CLUB, SPORTS ARENA 2000 and DOES 1 THROUGH 30 inclusive, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; and that I served the individuals on the service list attached hereto the following documents:

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER TO ENJOIN THE SUPER BOWL**

in the following manner: (Check one)

1) **XX** By personally delivering copies to the person served as noted on the attached service list.

2)\_\_\_ By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing copies (first class mail, postage prepaid) to the person served at the place where the copies were left.

3)\_\_\_ By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the

household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing copies (first class mail, postage prepaid) to the person served at the place where the copies were left.

4)___ By placing a copy in a separate envelope, with postage fully prepaid, for each address named below, and depositing each in the U.S. Mail at San Diego, California, on the _____ day of _____, 2002.

Executed this __6__ day of __January__, 2003, at San Diego, California.

Declarant  *Eliseo Villegas #807*

*Beverly Walker v. City of San Diego, et al.*
United States District Court Case No. 97cv1547BTM (LAP)

## SERVICE LIST:

Amy B. Vandeveld, Esq.                    Attorney for Plaintiffs
LAW OFFICES OF AMY B. VANDEVELD
1850 Fifth Avenue, Suite 22
San Diego, CA 92101